## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **ROBERT D. MAWHINEY,** | ) | **CASE NO. 8:05CV466** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM** |
| **v.** | ) | **AND ORDER** |
| | ) | |
| **WARREN DISTRIBUTION, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the court on the defendant, Warren Distribution, Inc.'s (Warren), Motion for Summary Judgment (Filing No. 77), the Motion to Quash Plaintiff's Subpoena to Chubb Insurance (Filing No. 90), the plaintiff, Robert Mawhiney's, Objection to the Motion to Quash (Filing No. 97), Mawhiney's Motion for Subpoenas (Filing No. 99), Mawhiney's Motion to Dismiss Warren's Motion for Summary Judgment (Filing No. 100), Mawhiney's Motion to Extend dates (Filing No. 106), and Mawhiney's Motion to Extend Pre-Trial Conference Date.  (Filing No. 109).

In his complaint, Mawhiney has asserted the following claims against Warren: (1) employment discrimination based on age under the Age Discrimination Employment Act (ADEA), 29 U.S.C. §§ 621-634; (2) employment discrimination based on race under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000 *et seq.*; (3) employment discrimination based on disability under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et. seq.*; (4) retaliation under Title VII for Internal Complaints; (5) retaliation based on his filing of workers' compensation claims; and (6) company looting of the plaintiff's gainsharing plan.

I have carefully reviewed the pleadings, the briefs, and the evidentiary materials filed by the parties. For the reasons explained below, the Court finds no genuine issues of material fact remain, and the Court concludes that summary judgment should be granted.

## FACTUAL BACKGROUND

Mawhiney is a Caucasian male who resides in Council Bluffs, Iowa, and was born on July 18, 1948. (Filing No. 1). Mawhiney is a former employee of Warren Distribution. Warren is a privately held company with its headquarters in Omaha, Nebraska. (Complaint).

Jerry Pivovar, Warren's Controller, and Chuck Downey, Warren's Vice-President interviewed Mawhiney for the position of cost accountant. Warren hired Mawhiney on March 16, 1998. (Mawhiney Dep. 43).[1] Throughout his employment with Warren, Mawhiney reported to Pivovar. (Mawhiney Dep. 52). Two weeks after Mawhiney began working in 1998, Warren hired Mike Juhlin as the Assistant Controller. (Filing No. 78, Ex. 2, Helen Adamson Affidavit at ¶ 4). [2]

While employed with Warren, Mawhiney filed three workers' compensation claims. (Adamson Aff., Ex. 6). The first injury occurred in November 1999, when Mawhiney fell in Warren's parking lot and lacerated his hand and knee. *Id.*

Mawhiney reported a second injury of chronic neck pain on April 27, 2000. (Mawhiney Dep. 131). Mawhiney attributed his neck problems to working intensely at his

---

[1] The deposition of Robert Mawhiney is at Filing No. 78, Attachments 1-5, and hereafter will be referenced as "Mawhiney Dep."

[2] The affidavit of Helen Adamson is at Filing No. 78, and includes Exhibits 3-21, and will hereafter be referenced as "Adamson Aff."

2

computer.  *(Id.* at 99).  Chubb Insurance, Warren's workers' compensation insurance carrier, denied coverage for Mawhiney's neck problems, but Warren approved paying the preliminary expenses for the neck injury.  *(Id.* at 137).  On or about April 12, 2002, Mawhiney filed a lawsuit against Warren in Iowa for workers' compensation benefits related to the neck injury.  (Adamson Aff. Ex. 4).

Mawhiney reported a third workers' compensation injury after he slipped and fell on oil at work on July 3, 2001, resulting in a torn rotater cuff.  (Mawhiney Dep. 29, 131).  On or about July 1, 2003, Mawhiney also filed a lawsuit against Warren in Iowa for workers' compensation benefits based on his shoulder injury.  (Mawhiney Dep. 135, Adamson Aff. Ex. 8).  On September 30, 2003, aided by counsel, Mawhiney completed a Deposition in contemplation of this lawsuit.  (Adamson Aff. Ex. 9).  As a result of the lawsuit, Mawhiney received a settlement for the shoulder injury of $9,000.  (Mawhiney Dep. 136).  Mawhiney alleges that after this deposition, on or around October 1, 2003 until his discharge on January 8, 2004, Jerry Pivovar and other company management personnel became extremely aggressive towards him ultimately terminating him for filing his claims.  (Filing No. 1).

In his complaint, Mawhiney alleges that part of this harassment was Mike Juhlin accosting him with racial slurs.  (Filing No. 1).  On June 11, 2003, Mawhiney filed an internal complaint stating that Mike Juhlin made racially offensive comments about Mawhiney's Hispanic wife.  ( Adamson Aff. at ¶ 8, Ex. 3).  Mawhiney complained that Juhlin called him Roberto because Mawhiney's wife and the "Mexicans" where she works were rubbing off on him.  *(Id.*)  Mawhiney also stated that Juhlin has commented in the past on his age, and once asked him if he was considering retirement.  *(Id.*)  In response to his

3

complaint, Juhlin apologized to Mawhiney, and Warren impaneled a committee of three employee members to investigate the incident in accordance with Warren's harassment policy.  In his deposition in preparation for this case, Mawhiney stated that he felt the committee did a good job but felt Juhlin should have been sanctioned.  (Mawhiney Dep. 203).  Mawhiney acknowledged that he was not sure what discipline, if any, Juhlin had experienced as a result of the complaint.  *(Id.*)

Mawhiney further alleges that in response to his workers' compensation deposition, his supervisor, Pivovar, removed accommodations previously given to Mawhiney for chronic neck pain and diabetes.  In deposition testimony, Mawhiney stated that his diabetes medication caused him to have urgent diarrhea and that on occasion he would drive home to use the bathroom and call Pivovar to tell him he went home sick.  (Mawhiney Dep.  99-100, 102, 106).  Mawhiney's diabetes also prevented him from walking or standing on concrete floors for long periods of time.  *(Id.* at 92-96).

In  December  2003,  Pivovar  discussed  an  analyst  position  with  Mawhiney. (Mawhiney Dep.  208).  In the course of these discussions, Mawhiney e-mailed Pivovar on or around December 19, 2003, in response to the proposal and stated:

> In terms of me short cutting the company by not physically being in the office for 40 hours per week, I go back to the duties and tasks originally assigned to me.  I have been performing them faithfully and as far as I know, satisfactorily for almost six years.  I have found ways to compress the work and provide the same level of expertise with less effort which has allowed me to take the necessary time to maintain a bearable level of pain in my neck and shoulder. . . . .So a long story to answer the question whether I'm interested in the Analyst job.  I am interested in the position, if Warren can accommodate my handicap(s).  I will not be intimidated into further damage to my neck by working through the pain.

4

(Adamson Aff. Ex. 13 at 5). In response to Mawhiney's e-mail, Pivovar sent Mawhiney a memorandum on December 30, 2003, that addressed a variety of issues. (*Id.*) Mawhiney claims that the memorandum was given to him as further harassment for the filing of his worker's compensation claim. The memo stated that while Pivovar believed Mawhiney to be an excellent Cost Accountant, he needed to address the fact that Mawhiney informed Pivovar he was not working 40 hours a week as well as various performance issues. (Adamson Aff. Ex. 13). Pivovar stated that he had been unaware that Mawhiney had modified his schedule due to his medical conditions to include short days, long lunches, and extended appointments. *(Id.)* Pivovar requested that, in the future, Mawhiney request in advance any anticipated flextime work hours, and that he include in the request his anticipated start time, stop time and lunch hour. *(Id.)* Furthermore, Pivovar informed Mawhiney that he needed to discontinue sending harsh and hardly worded e-mails to his colleagues. (*Id.*)

In response to the memorandum, Mawhiney filed a written complaint with Human Resources Director Helen Adamson. (Adamson Aff. at ¶ 8, Ex. 14). In his complaint, Mawhiney stated that he felt Pivovar's memorandum created a hostile work environment. (Adamson Aff. Ex. 14). Mawhiney requested that Adamson put together an objective group of associates to create a harassment committee to investigate the memorandum. (Adamson Aff. Ex. 14 at 4 & 5). On January 5, 2004, Adamson responded to Mawhiney's complaint stating that the memo "has not been found to constitute harassment and is not a violation of our company policy." *(Id.* at 3). Adamson went on to explain that the memo was "a response from [Pivovar] in regards to concerns he has related to your job responsibilities and working an unauthorized reduced schedule. This is similar to any form

5

of disciplinary/performance memo any supervisor has the responsibility to conduct in the scope of his/her job." *(Id.)* Adamson concluded that there were no statements in the memorandum that were unreasonable, severe, hostile or discriminatory. *(Id.)* Mawhiney appealed Adamson's decision to Warren CEO, Bob Schlott asking him to review the complaint. (Adamson Aff. Ex. 15). After reviewing the memorandum and Mawhiney's complaint to the memorandum, on January 8, 2004, Schlott terminated Mawhiney's employment. Schlott informed Mawhiney that, "[i]t's my conclusion that your ability and/or willingness to consistently interact constructively and positively in a non-adversarial manner with others in our organization is not sufficient for you to remain an associate of Warren." (Adamson Aff. Ex. 17).

On June 27, 2004, Mawhiney filed an amended charge of discrimination with the NEOC. (Adamson Aff. Ex. 20). He alleged unlawful discrimination on the basis of age, national origin by association, retaliation, and disability. On April 15, 2005, the NEOC determined that the evidence was insufficient to support Mawhiney's allegations of discrimination. (Adamson Aff. Ex. 21). On October 4, 2005, Mawhiney filed his civil complaint in this lawsuit.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for

trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson*, 477 U.S. at 248).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.  *See Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657-58 (8th Cir. 1997). Accordingly, a party moving for summary judgment must "set forth in the brief in support of the motion for summary judgment a separate statement of each material fact as to which the moving party contends there is no genuine issue to be tried and as to each shall identify the specific document or portion thereof or discovery response or deposition testimony ... which it claims established the fact."  NELR 56.1(a).

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting Fed. R. Civ. P. 56(e)).  A nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919,

922 (8th Cir. 1998).  In this respect, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts;' ...  [i]t must show there is sufficient evidence to support a jury verdict in [its] favor." *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998).

## DISCUSSION

In his complaint, Mawhiney has asserted six claims, all of which arise out of his employment relationship with Warren, and each of which will be discussed in turn.

**1.  Age Discrimination**

Mawhiney claims that Warren violated the ADEA by failing to have open competition for department promotions, denying Mawhiney training opportunities, and failing to give Mawhiney quality job assignments.

The ADEA prohibits employers from discriminating against employees on the basis of age. 29 U.S.C. § 623(a)(1). To establish a prima facie claim of age discrimination, Mawhiney must show (1) he was at least forty years old, (2) he was meeting his employer's legitimate performance expectations, (3) he suffered an adverse employment action, and (4) similarly-situated employees outside the class were treated more favorably. *See Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1035 (8th Cir. 2005).  Because Mawhiney presented no direct evidence of discrimination, the court will analyze his claim pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Once Mawhiney establishes a prima facie case, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for their actions. If the

8

defendant satisfies its burden, the burden shifts back to Mawhiney to show the defendant's proffered reason was pretextual.  *McDonnell Douglas*, 411 U.S. at 802, 804.

   a.  *Discrimination in Promotion*

   Warren argues that with respect to Mawhiney's first claim of age discrimination, that Warren did not have open competition for department promotions, Mawhiney has failed to demonstrate that he suffered an adverse employment action because he admitted that he did not apply for, and was not denied, any promotions.  The court agrees,  Mawhiney admitted that he did not apply for a promotion, and therefore, was never denied any promotion that he sought based on his age.  (Mawhiney Dep. 267, 284).  Accordingly, Mawhiney cannot establish a prima facie case that he was deprived promotions based on his age.

   b.  *Discrimination in Job Assignments*

   Similarly, Warren argues that Mawhiney's second claim of age discrimination, that he was not given favorable job assignments based on his age, fails because Mawhiney failed to demonstrate that he suffered an adverse employment action.  Mawhiney argues that Warren gave him unfavorable assignments and thereby isolated him and prevented him from being competitive in his position.  "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Wedow v. City of Kan. City, Mo.*, 442 F.3d 661, 671 (8th Cir. 2006) (quotation omitted). Theoretically, the Court agrees that a continual failure to provide quality assignments based on Mawhiney's age could produce a material employment disadvantage.

   However, Warren contends that Mawhiney did not know the reasons behind Pivovar's assignments of tasks, there is no evidence that the assignments were based on

9

an illegal reason, and Mawhiney is only guessing that assignments were based on age. Mawhiney's claim of age discrimination based on job assignments fails because Mawhiney has not provided any evidence that Pivovar assigned more favorable jobs to other employees, particularly younger or similarly situated employees. Accordingly, Mawhiney cannot establish a prima facie case that he was given less favorable assignments based on his age.

### c. Discrimination in Training

In Mawhiney's final claim of age discrimination, he alleges that Warren discriminated against him when it invested in training for a younger employee, Juhlin, and did not offer Mawhiney any additional training. Specifically, Mawhiney is arguing that by not allowing him to participate in training opportunities, Warren was isolating him and preventing Mawhiney from becoming competitive in his position. Warren counters that Mawhiney cannot establish that he suffered an adverse employment action because he admitted that he did not necessarily want the training Juhlin received and only asked for training on one occasion. (Mawhiney Dep. 265). Furthermore, Warren contends that it had a legitimate nondiscriminatory reason to offer Juhlin training and Mawhiney cannot prove that this is pretext.

Again, the denial of training opportunities can constitute an adverse employment action, and Warren concedes that it did not give him the same training that it provided to Juhlin. Therefore, taking Mawhiney's allegations as true, the Court concludes that he has established a prima facie case of age discrimination based on denial of training.

In response, Warren has articulated a nondiscriminatory reason for providing more extensive training to Juhlin, namely, that Juhlin as the Assistant Controller, had an entirely

10

different position than Mawhiney with different job responsibilities that warranted additional training. Courts are not to sit as a super-personnel department to oversee management decisions. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136-37 (8th Cir. 1999). Because Mawhiney has presented no evidence to show that Warren's reasons for providing Juhlin with more extensive training is a pretext for age discrimination, the Court concludes that Warren is entitled to summary judgment on all claims brought by Mawhiney under the ADEA.

## 2. Racial Discrimination

Mawhiney also claims that he was subjected to a hostile working environment based on race discrimination. Specifically, Mawhiney complains of Juhlin calling him "Roberto" stating, that Mawhiney's wife who is Mexican, and the Mexicans she worked with were rubbing off on Mawhiney. Mawhiney states that Juhlin made racially charged comments approximately every two months. Mawhiney submitted an internal complaint related to Juhlin's comments that is dated June 11, 2003. Warren seeks summary judgment on Mawhiney's hostile work environment claim because 1) the claim is time-barred, 2) Juhlin's comments did not amount to harassment, and 3) Warren took prompt and effective remedial action.

An employee must file an administrative charge of discrimination within the "three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Evidence of discrimination is ordinarily admissible only with respect to acts within the statutory limitations period preceding the filing of the charges. *See Holland v. Sam's Club*, --- F.3d

---, 2007 WL1518481, at *1 (8th Cir. 2007).  For purposes of a hostile work environment claim, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Morgan*, 536 U.S. at 117

Mawhiney's claim of racial discrimination stems from his June 11, 2003, internal complaint to Warren's management about Juhlin's comments.  Mawhiney acknowledges that after filing his internal complaint, he did not hear any additional racially derogatory remarks. (Exh. 1c Depo test. at 199-200).   Accordingly, Mawhiney's charge of discrimination that was filed with the NEOC on June 7, 2004, falls outside the 300 day statutory time period.  Therefore, his claim based on a hostile work environment in violation of Title VII is time-barred, and Warren is entitled to summary judgment on this claim.

**3.  Disability Discrimination**

Mawhiney next contends that Warren violated the ADA when it withdrew the accommodations that it had previously extended to him based on his disability.  Mawhiney complains that Pivovar withdrew reasonable accommodations when Pivovar 1) began requiring Mawhiney to account for work time; and 2) took away flexible scheduling and long lunches that Mawhiney used to rest his back and take care of his diabetes.  Warren contends that Mawhiney's claim fails because he is not disabled within the meaning of the ADA, and Mawhiney never requested or officially received the accommodations he is now claiming were removed.

Where no direct evidence of discrimination exists, ADA claims are evaluated by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

12

*Didier v. Schwan Food Co.*, 465 F.3d 838, 841 (8th Cir. 2006).  Under this framework, the plaintiff must first establish a prima facie case of discrimination: "that he has an ADA-qualifying disability; that he is qualified to perform the essential functions of his position, with or without a reasonable accommodation; and [that] he suffered an adverse action due to his disability." *Id.*

"[E]stablishing 'disability' is a significant hurdle that can prevent a person who was denied a job because of an impairment from being covered by the ADA." *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 842-43 (8th Cir. 2005).  Under the ADA, a "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A).  Determining whether an individual has a qualifying disability requires an individualized analysis of the claimed disability. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999).  "Major life activities under the ADA are basic activities that the average person can perform with little or no difficulty, including 'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' " *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 861 (8th Cir. 2006) (quoting 29 C.F.R. § 1630.2(i)).

Mawhiney's claim fails because he cannot establish that he is disabled as defined in the ADA.  Neither in the Complaint nor in  his response to Warren's Motion for Summary Judgment, does Mawhiney  specifically allege that he is substantially limited in one or more of the major life activities or that he was perceived to be disabled by Warren.  And, while Mawhiney's general allegations in his complaint appear to allege that he is  impaired in the

13

major life activity of working, the information contained in the record currently before the Court does not support such an allegation.

An impairment should be considered substantially limiting only if "an individual is '[s]ignificantly restricted as to the condition, manner or duration under which ... the average person in the general population can perform that same major life activity.'" *Moysis v. DTG Datanet*, 278 F.3d 819, 825 (8th Cir. 2002) (alteration in original) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).   Simply demonstrating that an impairment prevents one from performing job functions in the absence of accommodations does not suffice to demonstrate a disability. *Nuzum*, 432 F.3d at 842.  In his deposition, Mawhiney stated that he was able to perform his job and admitted that, other than minor limitations, his diabetes did not affect him at work. (Mawhiney Dep.113, 107).  Moreover, in both his deposition for this case, and for his workers compensation case, Mawhiney stated that after his neck injury he could work a normal day and was able to do all his assigned work. (Mawhiney Dep. 61, 122; Adamson Aff. Ex. 9).  And in fact, in his response to Warren's Motion for Summary Judgment, Mawhiney states that there were many occasions that he worked after quitting time, went to work early to get assignments completed, or worked special assignments on weekends. (Filing No. 88, Page 7 at ¶ 6).  Finally, in response to an NEOC Medical Questionnaire, a doctor who evaluated Mawhiney's spinal injuries opined that he was not substantially impaired in any major life activity. (Adamson Aff. Ex. 7).  For all these reasons, the Court concludes that Mawhiney has failed to establish a prima facie case of discrimination under the ADA, and Warren is entitled to summary judgment on the ADA claim.

**4. Retaliation in Violation of Title VII**

Next, Mawhiney claims that Warren terminated him in retaliation for filing his two internal complaints that include: (1) talking to Pivovar about his disappointment with his job assignments and training opportunities; and (2) his internal racial harassment complaint against Juhlin on Jun 11, 2003.[3]  Mawhiney must first establish a prima facie case of retaliation that: 1) he engaged in protected conduct; 2) a reasonable employee would have found the challenged action materially adverse; and, 3) the materially adverse action was causally linked to the protected conduct. *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007).

*a. Age Discrimination Internal Complaints*

Mawhiney first argues that he was terminated in retaliation for his complaints to Pivovar that his age adversely affected his job assignments and training opportunities. Warren argues that Mawhiney's claim fails as he did not engage in protected conduct, and because he cannot establish a causal connection between the complaints to Pivovar and his discharge.  The Court finds that Mawhiney's complaints of age discrimination to his employer constituted protected conduct, and therefore, Mawhiney has established the first and second prongs of his prima facie case for retaliation.  Mawhiney must also present some evidence of the third prong, that a causal connection exists between the protected conduct and the materially adverse employment action.

---

[3]Nowhere in Mawhiney's pleadings does Mawhiney raise a claim of retaliation under Title VII or any other statute for his complaint to Adamson and Schlott against Pivovar for harassment.

15

Having reviewed the evidence, the Court finds that Mawhiney has failed to establish a prima facie case of retaliation with respect to his age-related complaints to Pivovar because he cannot show the requisite nexus between those complaints and the adverse employment action of his termination. Indeed, Mawhiney has proffered no evidence indicating that Pivovar was a decision-maker for, or was in any way involved in his termination. In fact, the record clearly shows that Schlott was the decision-maker regarding Mawhiney's termination. Mawhiney has not provided any evidence to show that Scholtt was aware of Mawhiney's internal complaints of age discrimination. Therefore, Mawhiney's claim of retaliation under Title VII is denied.

*b. Racial Harassment Internal Complaint*

Next, Mawhiney argues that he was terminated in retaliation for his complaint of racial harassment against Juhlin. There is sufficient evidence to support the first and second prongs of Mawhiney's prima facie case, and so the Court turns to the third prong to determine whether there is evidence of a causal connection between the protected conduct and the adverse employment action.

Mawhiney made his claim of racial harassment on June 11, 2003, well before his January 8, 2004 termination. The Eighth Circuit has held "that the time interval of more than two months is too long to support an inference of causation." *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616 (8th Cir. 2003)*; see also Jagger v. Missouri Dept. of Corrections*, 2006 WL 3161423, at *6 (W.D. Mo. October 31, 2006) (citing *Trammel)*. Furthermore, as Warren states in its brief, Mawhiney has conceded that his only other evidence of retaliation for his internal complaint of racial harassment is his own perception that management lacked concern over Juhlin's comments. This is insufficient to establish

16

the requisite causal nexus between the protected conduct and the materially adverse employment action.  Accordingly, the Court concludes that summary judgment on the race-related retaliation claim will be granted to Warren.

## STATE LAW CLAIMS

The remaining claims in Mawhiney's complaint are governed by state law, and, because I have dismissed all of the federal question claims, the Court has jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

## 5. Retailitaion For Filing Worker's Compensation Claim

Plaintiff argues that Warren terminated his employment in retaliation for the filing of his Workers' Compensation Claims.  Mawhiney argues that he became a target for termination subsequent to giving a deposition in his workers' compensation case on September 30, 2003.  Mawhiney contends that from October 1, 2003, until his discharge on January 8, 2004, his supervisor, Pivovar, and other company management created a hostile work environment cumulating in termination.  Warren counters that his claim fails as a matter of law because he filed his workers' compensation claims in Iowa, and Nebraska has not recognized a wrongful discharge claim in violation of a public policy based on another state's statute.  Moreover, Warren argues that Warren had a legitimate reason to terminate Mawhiney which he cannot show is pretext.

17

a.    *Conflict of Laws Analysis*

While Warren analyzed this claim under Nebraska law, because Mawhiney brought his workers compensation claim in Iowa, and Warren is located in Nebraska, the Court must first consider which State's law applies.  Because the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, the Court will apply  the  conflicts-of-laws rules of Nebraska, the forum state, to determine the substantive law that applies to the case. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941); and *Mertz v. Pharmacists Mut. Ins. Co.*, 625 N.W.2d 197, 202 (Neb. 2001).  In Nebraska, "[t]he first step in a conflict-of-law analysis is to determine whether there is an actual conflict between the legal rules of different states. . . .  An actual conflict exists when a legal issue is resolved differently under the law of two states." *Johnson v. U.S. Fid. and Guar. Co.*, 696 N.W.2d 431, 436 (Neb. 2005).

Here, there is likely a genuine conflict.  While the laws governing the Nebraska and Iowa public policy exception to employment at will based on retaliation for an employee filing a workers' compensation case are similar, there are material differences.  Unlike Nebraska law, Iowa law requires that when establishing the causal connection between the protected conduct and the adverse employment action, the plaintiff must demonstrate that the protected conduct was a determining factor in the employer's decision to terminate the plaintiff's employment. *Weinzetl v. Ruan Single Source Transportation Co.*, 587 N.W.2d 809, 810 (Iowa App. 1998).  A determining factor is one that tips the scales decisively in either direction. *Id.*

Next, when determining what law to apply, Nebraska follows the Restatement (Second) of Conflicts of Laws. *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001). "The rights and liability of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 145. The court should consider: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties centered." *Id.*

Here, the first factor weighs towards Nebraska law as the injuries occurred in Nebraska when the plaintiff was terminated at Warren's offices located in Nebraska. Similarly, the second factor weighs towards Nebraska as all of the incidents of alleged harassment leading up to the termination occurred in Nebraska at Warren's offices. The third factor does not weigh towards either party as Warren is located in Nebraska and Mawhiney is located in Iowa. Finally, the fourth factor weighs in favor of Nebraska as the relationship between the parties developed while Mawhiney was working at Warren's offices in Nebraska. Applying all these factors, the Court finds that Nebraska law has the most significant relationship to Mawhiney's retaliatory discharge claim, and the Court will apply Nebraska law to the claim.

Warren first argues that Mawhiney's claim is not cognizable under Nebraska law because Mawhiney filed his workers compensation claim under Iowa law. The Court is not

19

persuaded by this argument.[4]  The general rule in Nebraska is that unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason.  *Jackson v. Morris Communications Corp.*, 657 N.W.2d 634 (Neb. 2003).   Under the public policy exception to the at-will employment doctrine, however, an employee can claim damages for wrongful discharge when the motivation for the firing contravenes public policy.  *Id.*  In *Jackson*, the Nebraska Supreme Court recognized that the Nebraska Workers' Compensation Act presents a clear public policy mandate that justifies an exception to the at-will employment doctrine.  *Id.*  In so holding, the Nebraska Supreme Court quoted the Supreme Court of Nevada's reasoning in adopting a similar law noting that:

> in order for the goals of the Act to be realized and for public policy to be effectuated, the employee must be able to exercise his right in an unfettered fashion without being subject to reprisal.  If employers are permitted to penalize employees for filing workmen's compensation claims, a most important public policy would be undermined.  The fear of being discharged would have a deleterious effect on the exercise of a statutory right.

*Id.* at 639 (citing *Hansen v. Harrah's*, 675 P.2d 394 (Nev. 1984)).  The Nebraska Supreme Court continued, stating that "[t]he Nebraska Workers' Compensation Act was promulgated to serve an important public purpose, and a rule which allows fear of retaliation for the filing of a claim undermines that policy."  *Id.* at 640-41.  Accordingly, clearly the intent of the public policy exception is to prevent the chilling effect that retaliation  would have on a worker's freedom to file a worker's compensation claim.  Because in this case Mawhiney is an employee of a Nebraska company who suffered a work injury while working for an

---

[4]It is of note that this case presents an unusual set of circumstances where an employee of a Nebraska company is a resident of Iowa and filed his worker's compensation claim in Iowa.

employer based in Nebraska, allowing an employer to retaliate against him for the filing of a workers' compensation claim would contravene the public policy articulated in the State's workers compensation statutes.

      *b.*    *Prima Facie Case*

To establish a prima facie case of unlawful retaliation based on the filing of a workers' compensation claim, an employee must show that he or she participated in a protected activity, that the employer took an adverse employment action against him or her, and that a causal connection existed between the protected activity and the adverse employment action. *Riesen v. Irwin Indus. Tool Co.*, 717 N.W.2d 907, 915 (Neb. 2006). In cases involving retaliatory discharge for filing a workers' compensation claim, a "claimant's 'prima facie case is not an onerous burden under the *McDonnell Douglas* burden-shifting scheme.' " *Id.* at 916-17 (citiations and quotations omitted).

Here, there is no dispute that Mawhiney can establish the first two elements of the prima facie case, but the causal nexus element is more troublesome. In *Riesen*, the Nebraska Supreme Court referred to the following factors when determining a causal connection:

> [c]ircumstantial evidence sufficient to establish a causal link between termination and filing a compensation claim includes: (1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false.

717 N.W.2d at 916 (*citing Continental Coffee Products v. Cazarez*, 937 S.W.2d 444, 451 (Tex. 1996)).  Mawhiney states that he became the target for termination following his

deposition related to the workers' compensation claim, which was given on September 30, 2003.  To establish a causal connection between his workers' compensation claim and his termination, Mawhiney sets forth the following facts that: (1) Pivovar showed open and angry agitation toward Mawhiney regarding Mawhiney's deposition statements about work-load; (2) Mike Juhlin accosted Mawhiney with racial slurs against Mawhiney's wife; (3) Pivovar issued the memorandum concerning Mawhiney's job performance; (4) Chuck Downey reneged on promises to address complaints concerning age discrimination in departmental assignments; (5) Helen Adamson denied Mawhiney's request for a committe to review Pivovar's memorandum; and (6) Mawhiney's sudden termination by CEO Schlott. Mawhiney also states that the following facts are proof of a causal connection:(1) Chad Bell, the assistant to the credit manager in the telemarketing group, made the statement that "at least I don't go running to workers' comp for a little scratch on my finger"; and (2) Diane Alexander, a receptionist, teased Mawhiney by warning him to "watch out for water spills."

I conclude that Mawhiney's allegations are insufficient to establish the causal nexus. With respect to Pivovar's open and angry agitation concerning plaintiff's work load, Mawhiney has proffered  no evidence of this behavior and has not alleged that Pivovar made any specific derogatory statements with respect to Mawhiney's workers' compensation claims.  Furthermore, as is evidenced in Pivovar's memorandum regarding Mawhiney's job performance, Pivovar's concern was that Mawhiney admitted he was not working a 40 hour work week, even though Warren paid Mawhiney for 40 hours of work. This is a legitimate supervisory concern, and is not evidence that Mawhiney was terminated based on the filing of his Workers' Compensation Claims.  Similarly, Adamson's

refusal to establish a committee to review Pivovar's memorandum does not support Mawhiney's claim. Adamson informed Pivovar that she believed the memorandum was a proper effort by Pivovar to coach Mawhiney and nothing contained in the memorandum supported Mawhiney's claim of harassment. A review of the memorandum and Adamson's response, supports Adamson's conclusions. At no point in her response to Mawhiney did she indicate any animus or retaliatory attitude related to Mawhiney's filing of Workers' Compensation Claims.

With respect to Mawhiney's reference to Juhlin's racial harassment, the record shows that Mawhiney made an official complaint about the harassment in June 2003 -- before giving his workers' compensation case deposition. Nowhere in Mawhiney's pleading does he reference any additional racial harassment occurring after his workers' compensation deposition.

While Mawhiney does identify two instances of individuals making derogatory comments concerning the filing of his workers' compensation claims, these comments are not sufficient to overcome Warren's properly supported motion for summary judgment. The stray comments were made by two individuals who were not involved in the decision-making process regarding Mawhiney's termination. *See Mohr v. Dustrol, Inc.,* 306 F.3d 636, 640-41 (8th Cir. 2002) (distinguishing between comments that demonstrate a discriminatory animus in the decisional process from "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process")

Finally, Mawhiney alleges that his sudden termination by CEO Schlott establishes the causal nexus. Schlott's termination of Mawhiney occurred in January 2004,

approximately three months after Mawhiney gave his deposition in the workers' compensation case. To show a causal connection, the temporal proximity between the protected activity and adverse action is relevant but is generally insufficient to overcome summary judgment if it is the only evidence of retaliation. *Stuart v. General Motors Corp.*, 217 F.3d 621, 635 (8th Cir. 2000). Furthermore, as the Court previously noted in this Memorandum and Order, the Eighth Circuit has held "that the time interval of more than two months is too long to support an inference of causation." *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616 (8th Cir. 2003). Therefore, Scholtt's sudden termination of Mawhiney cannot alone prove a causal nexus between his termination and his Worker's Compensation Claims. Based on this record, Mawhiney has failed to establish a prima facie case of retaliation.

### c. Pretext

Even if the Court were to assume facts supporting Mawhiney's prima facie case based on retaliatory discharge for filing his workers' compensation case, the Court concludes there is no proof that Warren's stated reason for the discharge is a pretext for retaliation. Warren has articulated a nondiscriminatory reason for terminating Mawhiney, namely, his baseless accusations of harassment and lying against his supervisor Pivovar, his failure to interact appropriately with coworkers, and his failure to work 40 hours a week. Absent proof that this stated reason is false or a pretext to cover up an unlawful employment decision, the Court refuses to second-guess Warren's management decisions. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136-37 (8th Cir. 1999).

24

Plaintiff has submitted no additional evidence to show that the defendant's proffered reasons for his termination was merely a pretext for discrimination. Therefore, after careful review of the record, I conclude that there is insufficient evidence to submit this claim to a jury.

## 6. Company Looting

Finally, Mawhiney makes the general claim of "company looting." Mawhiney has not presented any factual or legal basis supporting this claim. Furthermore, as Warren indicates in its brief, neither Mawhiney's pleadings nor Mawhiney's deposition clarify the factual or legal basis for this claim. Therefore, I conclude that plaintiff's final claim should be dismissed as Mawhiney has failed to establish a claim for which relief can be granted.

For all the reasons provided herein, the Court concludes that Warren is entitled to summary judgment on all claims made against it by Mawhiney.

IT IS ORDERED:

1. The Defendant's Motion for Summary Judgment (Filing No. 77) is granted;

2. The Defendant's Joint Motion to Quash Plaintiff's Subpoena (Filing No. 90) is denied as moot;

3. The Plaintiff's Objection to the Motion to Quash (Filing No. 97) is denied as moot;

4. The Plaintiff's Motion for Subpoenas (Filing No. 99) is denied as moot;

5. The Plaintiff's Motion to Dismiss the Defendant's Motion for Summary Judgment (Filing No. 100) is denied;

6. The Plaintiff's Motion to Reset all Hearings (Filing No. 106) is denied as moot;

7.      The Plaintiff's Motion to Extend (Filing No. 109) is denied as moot; and

8.       The Clerk of Court is directed to send a copy of this Memorandum and

Order to the Plaintiff at his last known address.

DATED this 11th day of June, 2007.

                              BY THE COURT:


                              s/Laurie Smith Camp
                              United States District Judge